**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DEDRA JACKSON, AND ALL OTHERS SIMILARLY SITUATED UNDER 29 USC 216(B),** | § § § | |
| | § | |
| **Plaintiff** | § | **NO. 3:15-CV-03125-P** |
| | § | |
| **vs.** | § | |
| | § | |
| **SUPERIOR HEALTHPLAN, INC. and CENTENE COMPANY OF TEXAS, L.P.,** | § § § | |
| | § | |
| **Defendants.** | § | |
| | § | |

<u>**RESPONSE TO PLAINTIFF'S MOTION FOR NOTICE TO POTENTIAL PLAINTIFFS
AND CONDITIONAL CERTIFICATION**</u>

Kimberly R. Miers
Texas State Bar No. 24041482
Saba H. Alvi
Texas State Bar No. 24082324
Jeremy W. Hawpe
Texas State Bar No. 24046041

LITTLER MENDELSON, P.C.
A Professional Corporation
2001 Ross Avenue
Suite 1500, Lock Box 116
Dallas, TX 75201.2931
214.880.8100
214.880.0181 (Fax)
kmiers@littler.com
salvi@littler.com
jhawpe@littler.com

ATTORNEYS FOR DEFENDANTS
SUPERIOR HEALTHPLAN, INC. and
CENTENE COMPANY OF TEXAS, L.P.

# TABLE OF CONTENTS

PAGE

I.      SUMMARY OF THE ARGUMENT ................................................................. 1

II.     PROCEDURAL HISTORY ............................................................................. 4

III.    FACTUAL BACKGROUND ........................................................................... 4

        A.      Centene Company of Texas and Superior Healthplan, Inc ................... 4

        B.      Service Coordinators ........................................................................... 6

        C.      Plaintiff's Employment ........................................................................ 8

        D.      Opt-In Plaintiffs ................................................................................. 9

IV.     PLAINTIFF IS NOT SIMILARLY SITUATED TO THE PUTATIVE CLASS
        MEMBERS .................................................................................................. 11

        A.      Plaintiff Cannot Credibly Claim She is Similarly Situated to Putative Class
                Members in 4 of 7 Offices and 10 of 14 DSAs.................................... 13

V.      ARGUMENT ................................................................................................ 17

        A.      Legal Standard for Conditional Certification ...................................... 17

        B.      Plaintiff Cannot Even Meet the Lenient Lusardi Standard ................... 20

                1.      Plaintiff is Not Similarly Situated to The Putative Class Members......... 20

                2.      There is No Common Illegal Policy ........................................... 21

                3.      Plaintiff's Misclassification Claims Require Individualized
                        Analysis.................................................................................. 22

        C.      Proposed Notice .................................................................................. 24

VI.     CONCLUSION.............................................................................................. 25

# TABLE OF AUTHORITIES

PAGE

## CASES

*Abila v. AMEC Foster Wheeler N. Am. Corp.*,
No. H-15-1238, 2016 U.S. Dist. LEXIS 69037 (S.D. Tex. May 26, 2016)..............................3

*Aguirre v. SBC Commc'ns, Inc.*,
No. H-05-3198, 2007 U.S. Dist. LEXIS 17259 (S.D. Tex. Mar. 12, 2007) ...............19, 23, 21

*Badgett v. Texas Taco Cabana, L.P.*,
No. H-05-3624, 2006 U.S. Dist. LEXIS 74530 (S.D. Tex. Oct. 12, 2006) ...........................19

*Basco v. Wal-Mart Stores, Inc.*,
No. 00-3184 , 2004 U.S. Dist. LEXIS 12441 (E.D. La. July 1, 2004) ...................................18

*Blake v. Hewlett-Packard Co.*,
No. 4:11-CV-592, 2013 WL 3753965 (S.D. Tex. July 11, 2013) ..........................................21

*Bramble v. Wal–Mart Stores, Inc.*,
No. 09–CIV–4932(TNO), 2011 WL 1389510 (E.D. Pa. Apr. 12, 2011) ...............................22

*Casanova vs. Gold's Tex. Holdings Grp., Inc.*, 2014 U.S. Dist. LEXIS 161844, at *4 ..............21

*Colson v. Avnet, Inc.*,
687 F.Supp.2d 914 (D. Ariz. 2010) ......................................................................................22

*Elliott v. Dril-Quip, Inc.*,
No. CV H-14-1743, 2015 WL 7302764 (S.D. Tex. Nov. 18, 2015) ......................................21

*Harris v. Fee Transp. Servs., Inc.*,
No. CIV.A.3:05CV0077-P, 2006 WL 1994586 (N.D. Tex. May 15, 2006) ..........................19

*Hoffmann-La Roche, Inc. v. Sperling*,
493 U.S. 165 (1989).............................................................................................1, 17, 19

*Johnson v. TGF Precision Haircutters, Inc.*,
No. CIV.A. H-03-3641, 2005 WL 1994286 (S.D. Tex. Aug. 17, 2005) ...............................24

*Kelly v. Healthcare Servs. Group*,
No. 2:13-cv-00441, 2013 U.S. Dist. LEXIS 149204 (E.D. Tex. Oct. 16, 2013).....................2

*Lang v. DirecTV, Inc.*,
No. 10-1085, 2011 U.S. Dist. LEXIS 150047 (E.D. La. Dec. 30, 2011)..................................3

## TABLE OF AUTHORITIES
## (CONTINUED)

**PAGE**

*Lentz v. Spanky's Rest. II, Inc.*,
   491 F.Supp.2d 663 (N.D. Tex.2007) .......................................................................20

*Lusardi v. Xerox Corp.*,
   118 F.R.D. 351 (D.N.J. 1987)....................................................................18, 19, 20

*Marshall v. Eyemasters of Texas, Ltd.*,
   272 F.R.D. 447 (N.D. Tex. 2011) ............................................................................19

*McKnight v. D. Hous., Inc.*,
   756 F. Supp. 2d 794 (S.D. Tex. 2010) ......................................................2, 19, 20

*Metcalfe v. Revention, Inc.*,
   2011 U.S. Dist. LEXIS 83966 (S.D. Tex. Aug. 1, 2011).......................................20

*Mooney v. Aramco Servs. Co.*,
   54 F.3d 1207 (5th Cir. 1995) .................................................................17, 18, 21

*Proctor v. Allsups Convenience Stores, Inc.*,
   250 F.R.D. 278 (N.D. Tex. 2008) .....................................................................18, 19

*Ray v. Motel 6 Oper. Ltd.*,
   No. 3-95-828, 1996 U.S. Dist. LEXIS 22565 (D. Minn. 1996).............................19

*Reich v. Page & Addison, P.C.*,
   Case No. 3:91-CV-2655-P (N.D. Tex. Mar. 9, 1994).............................................3

*Reyes v. Texas Ezpawn, L.P.*,
   No. CIV.A. V-03-128, 2007 WL 101808 (S.D. Tex. Jan. 8, 2007)...........21, 23, 24

*Richardson v. Wells Fargo Bank, N.A.*,
   No. 4:11-cv-00738, 2012 U.S. Dist. LEXIS 12911 (S.D. Tex. Feb. 2, 2012) ....................2, 19

*Roussell v. Brinker Int'l, Inc.*,
   441 F. App'x 222 (5th Cir. 2011) ..........................................................................18

*Shushan v. Univ. of Colo. at Boulder*,
   132 F.R.D. 263 (D. Colo. 1990) .............................................................................18

*Stiles v. FFE Transp. Servs., Inc.*,
   No. CIV.A.309-CV-1535-B, 2010 WL 935469 (N.D. Tex. Mar. 15, 2010) ..........19

*Vasquez v. Vitamin Shoppe Indus. Inc.*,
   No. 10 CIV. 8820 LTS THK, 2011 WL 2693712 (S.D.N.Y. July 11, 2011) .........22

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGE**

*Vela v. City of Houston*,
 276 F.3d 659 (5th Cir. 2001) ................................................................................21

**STATUTES**

Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ............................................ passim

29 C.F.R. § 541.2 ................................................................................................23

29 C.F.R. § 541.200 ............................................................................................22

29 C.F.R. § 541.300 ............................................................................................22

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DEDRA JACKSON, AND ALL OTHERS SIMILARLY SITUATED UNDER 29 USC 216(B),** | § § § | |
| | § | |
| **Plaintiff** | § | **NO. 3:15-CV-03125-P** |
| | § | |
| **vs.** | § | |
| | § | |
| **SUPERIOR HEALTHPLAN, INC. and CENTENE COMPANY OF TEXAS, L.P.,** | § § § | |
| | § | |
| **Defendants.** | § § | |

**RESPONSE TO PLAINTIFF'S MOTION FOR NOTICE TO POTENTIAL PLAINTIFFS AND CONDITIONAL CERTIFICATION**

Defendants[1] Superior Healthplan, Inc. and Centene Company of Texas, L.P. (hereinafter collectively "Defendants") hereby file their Response in Opposition to Plaintiff's Motion for Notice to Potential Plaintiffs and Conditional Certification and state as follows:

**I.
SUMMARY OF THE ARGUMENT**

The only substantive question raised by Plaintiff's Motion is whether this Court should allow Plaintiff to give notice of this case to other present and former employees of Centene Company of Texas, L.P. ("Centene") and invite them to opt-in if they so choose.  The Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), does not require certification of collective actions and whether the Court elects to intervene is a matter committed to the Court's sound discretion. *Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989).

---

[1] Plaintiff has improperly named Superior Healthplan, Inc. as her employer and a Defendant in this case. Superior Healthplan, Inc. denies it was Plaintiff's employer.

1

> Even at the notice stage, conditional certification "should be denied if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice."   The fundamental inquiry is whether the [plaintiff shows] "some identifiable facts or legal nexus that bind the claims so that hearing the cases together promotes judicial efficiency."

*Kelly v. Healthcare Servs. Group*, No. 2:13-cv-00441, 2013 U.S. Dist. LEXIS 149204, 5-6 (E.D. Tex. Oct. 16, 2013) (quoting *Richardson v. Wells Fargo Bank, N.A.*, No. 4:11-cv-00738, 2012 U.S. Dist. LEXIS 12911 at *2 (S.D. Tex. Feb. 2, 2012) and citing *McKnight v. D. Hous., Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010)).

The Court should not exercise its discretion to conditionally certify this matter because, even at this early stage, it is already evident that it cannot be tried in a collective manner.  The principal question in this case is whether Defendants can prove Level II Service Coordinators perform job duties that exempt them from the overtime pay requirements of the FLSA.   In answering that question, the Court examines the job duties of the plaintiffs to determine if their job duties fall within any of the FLSA's exemptions asserted by Defendants.[2]  Here, there is no factual or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency.  The differences in job duties among the putative class members make it impossible for the Court to present only one question to the jury regarding all plaintiffs. Rather, the putative class members are so diverse in their job duties and responsibilities that liability can only be determined by conducting an individualized analysis of *each and every* plaintiff.   Thus, Defendants will be entitled to a jury finding as to whether an exemption applies to *each* of its Level II Service Coordinators.

A similar conclusion was reached by Judge Jorge A. Solis in one of the few FLSA exemption cases to be tried to a jury in the Northern District of Texas.  Faced with allegations by

[2] In this case, Defendants will assert the Administrative Exemption for some plaintiffs, the Professional Exemption for some plaintiffs and the Combination Exemption for some plaintiffs.

the United States Department of Labor that a law firm's paralegals were non-exempt employees, Judge Solis submitted questions to the jury regarding the law firm's exemption defense with respect to *each* of the 23 paralegals.[3]  Imagine the same jury charge when hundreds of putative class members are involved.  Conditionally certifying this matter would not promote judicial efficiency—it would have the opposite effect.

In addition to the disparate job duties *among* putative class members, the job duties for individual putative class members have changed during the relevant time period due to the introduction of new products, special assignments and workload levels.  In some instances, the jury may determine that a Level II Service Coordinator was exempt from the FLSA during part, but not all, of his or her employment.  As a result, the variations in job duties among the putative class are compounded by the changing job duties of a given plaintiff.

Rather than explain how the Court can manage this complexity, Plaintiff asks this Court to take the seemingly easy way out by ruling on her Motion without considering the evidence of record and applying an extremely lenient standard that is nonsensical under these circumstances.

> A "decision to certify, even if subject to correction at the decertification stage, is not without consequences" as "[t]oo much leniency at the notice stage can lead to a 'frivolous fishing expedition conducted by the plaintiff at the employer's expense'" and "extreme leniency at the notice stage can result in conditional certification that must later be revoked at the eve of trial . . . when it becomes obvious that manageability concerns make collective action impossible." Therefore, while the notice stage standard is lenient, it is not automatic.

*Abila v. AMEC Foster Wheeler N. Am. Corp.*, No. H-15-1238, 2016 U.S. Dist. LEXIS 69037 (S.D. Tex. May 26, 2016) (citations omitted) (quoting *Lang v. DirecTV, Inc.*, No. 10-1085, 2011 U.S. Dist. LEXIS 150047 at *6 (E.D. La. Dec. 30, 2011).  Because this case is too complex to be

---

[3] App. 1-19, Ex. A, Charge to the Jury in *Reich v. Page & Addison, P.C.*, Case No. 3:91-CV-2655-P (N.D. Tex. Mar. 9, 1994).

tried in a representative fashion, facilitating notice to hundreds of additional plaintiffs would be an exercise in futility—one that will only result in needless expense to the parties, confusion to the opt-in plaintiffs (who will inevitably be dismissed), and a waste of this Court's resources. Accordingly, this Court should deny Plaintiff's Motion, rule that this case cannot be tried as a collective action, and dismiss without prejudice those plaintiffs who have opted-in thus far.

## II.
## PROCEDURAL HISTORY

On September 25, 2015, Plaintiff filed her Original Complaint alleging violations of the FLSA on behalf of herself and others she alleges are similarly situated to her.[4]  On April 29, 2016, Plaintiff filed a Motion for Notice to Potential Plaintiffs and Conditional Certification seeking to certify a class of:

> "All current and former Field Service Coordinators (who were categorized, known or identified specifically as "Level 2," "Level II," "LPN," "LVN," or "LCSW" Field Service Coordinators) who worked for Defendants in the state of Texas from April 2013 to the present and were paid primarily on a salaried basis (the "Potential Plaintiffs")."[5]

## III.
## FACTUAL BACKGROUND

**A.     Centene Company of Texas and Superior Healthplan, Inc.**

Centene is a managed care company that develops unique government-sponsored health plans for under-insured and uninsured individuals.[6]  Superior Healthplan, Inc. ("Superior")—a health maintenance organization that has been providing services in Texas since 1999—is a wholly owned subsidiary of Centene operating in the state of Texas.[7]

---

[4] [Doc. No. 1].
[5] [Doc. No. 30].
[6] App. 21, Ex. B, ¶ 3, Ross Declaration.
[7] Id.

Superior provides managed care services under contract with the State of Texas. It administers health care benefits to its members and manages a member's entire care plan.[8] Superior manages a wide variety of state health programs in partnership with the State of Texas including, but not limited to:

- Children's Health Insurance Program ("CHIP"): Health care coverage available to families who earn too much money to qualify for Medicaid, but who cannot afford to buy private insurance.

- CHIP Perinatal Care:  Designed to provide prenatal and delivery services to unborn children of low-income pregnant women who do not qualify for Medicaid.

- STAR: (Medicaid): Health care coverage for many low-income families.

- STAR Health: Health care coverage for children/young adults in foster care.

- STAR+PLUS (Medicaid): Health care coverage for qualified individuals who are elderly or who have a disability.

- Medicare Medicaid Program ("MMP"): Health care coverage for individuals who qualify for services from both Medicare and Medicaid.[9]

Superior provides a wide variety of services to various member populations including, but not limited to:

- Nursing Facility Services: manages members who reside in nursing facilities and the process when members transition from a nursing facility into the community.

- Long Term Support Services (LTSS): coordinates home-delivery meals, emergency response systems and provider services.

- Individuals with Intellectual Developmental Disabilities (IDD members)

- Foster care members

- Members who are children in low-income families

- Members who are low-income pregnant women

- Elderly members who qualify for Medicaid

- Physically disabled members who qualify for Medicaid[10]

---

[8] Id.
[9] Id.
[10] Id.

Superior provides managed care services in 14 different Delivery Service Areas and has 7 offices throughout Texas.[11]

## B.      Service Coordinators

Superior employs Service Coordinators to coordinate service for the needs of health plan members through collaboration with medical, behavioral and social support staff.[12]   Service Coordinators manage member screening and risk assessment interventions, coordinate member care, educate providers and community resources on program services and develop and modify service plans.[13]   How Service Coordinators carry out these responsibilities varies widely based on numerous factors such as the product line, the Delivery Service Area ("DSA"), the member population, the Service Coordinator's education/experience, the preferences of the Service Coordinator, the preferences of the Service Coordinator's supervisors and staffing levels.[14]   The job duties of Service Coordinators also vary based on the stage of the product line's implementation.[15]   For example, the job duties of a Service Coordinator working on a new product line that is being rolled out for the first time are different from the job duties of a Service Coordinator working on an established product wherein members and service providers are intimately familiar with the eligible services and government-mandated requirements for receiving services.[16]

Some Service Coordinators have additional job duties that are unique to them.   For example, a Service Coordinator in Lubbock, Texas is responsible for reviewing upcoming home

---

[11] Id.
[12] Id.
[13] Id.
[14] Id.
[15] Id.
[16] Id.

assessments that need to be completed for the following month.[17]   He identifies where members are located and whether they are still eligible for services.[18]   He then assigns the members to different Service Coordinators on his team and submits a report to the scheduling department so they can schedule appointments.[19]   This task requires him to attend telephone meetings three times a week in order to follow up on the progress of scheduling the appointments and to discuss any problems that arise in scheduling the appointments.[20]   No other Service Coordinator on his team has this job duty.[21]   It is unique to him.[22]

Additionally, some Service Coordinators work on various special projects from time to time pursuant to a wide range of unique needs related to a particular product line, DSA, staffing levels or the roll out of a new product.   For example, one Service Coordinator, Dorothy Acker, worked on a special project from her home for approximately three months that involved service vendor reviews.[23]   Due to the size of a DSA and staffing levels, the Service Coordinators are sometimes unable to see all of the members in the DSA.[24]   To alleviate the workload, Superior uses a service vendor to assist in completing assessments.[25]   From February through April 2016, Acker spent the majority of her time reviewing and approving/denying assessments conducted by a service vendor.[26]   Another Service Coordinator, Elizabeth Zaragoza, assisted Superior with completing Medicare waivers for StarPlus members because she has many years of experience

---

[17] App. 44-45, Ex. C, Garcia Declaration, ¶ 18.
[18] Id.
[19] Id.
[20] Id.
[21] Id.
[22] Id.
[23] App. 50-51, Ex. D, Acker Declaration, ¶14.
[24] Id.
[25] Id.
[26] Id.

working with Medicare waivers.[27]  Zaragoza testified that during the time period she worked on Medicare waivers, her job was very different than it is now.[28]

## C.     Plaintiff's Employment

Plaintiff Dedra Jackson was employed as a Field Service Coordinator from approximately July 2014 to October 2015.[29]  During this time, she supported the Medicare Medicaid Program.[30]  **Notably, even Plaintiff has described her job duties as a Service Coordinator as varying significantly at different times.**  In her declaration, Plaintiff states her job duties as:

> As a Level 2 Coordinator, I conducted in-home visits to obtain participants' answers to standardized medical questions, traveled to/from participants' homes to perform these visits, input participant's answers into Defendants' automated system, and collected participants' medical authorizations in order for Defendants to make a decision regarding approval or disapproval of medical care or medical supplies.
>
> I did not provide clinical care to patients but retrieved answers and documentations from participants in government sponsored health care plans.[31]

However, in her own resume, Plaintiff described her job duties as:

> Identify special needs members through the completion of health screens and other resources, work with community outreach/member advocates to coordinate member care, educate providers and community resources on program components and available support services, educate members with special needs to foster compliance with program and positively impact outcomes.[32]

---

[27] App. 57, Ex. E, Zaragoza Declaration ¶ 19.

[28] Id.

[29] App. 20-40, Ex. B, Ross Declaration. Notably, during this approximately 65 weeks of employment, Plaintiff had the day off (for various reasons including holidays, sick time, vacation, leave of absence) at least one day per week for 26 weeks during her employment; thus, undermining the plausibility of her claim that she "regularly worked at least 70 hours on Defendants' behalf in a week." App. 27-30, Ex. B-1, Jackson Time Records; Jackson Declaration, ¶6 [Doc. No. 30-9].

[30] App. 23, Ex. B, ¶ 8, Ross Declaration.

[31] Id.

[32] App. 31, Ex. B-2, Jackson Resume.

Additionally, in her 2015 Performance Review, Plaintiff stated: "With the training that I have received I have current knowledge of provider network strategy, reimbursement methodologies, and medical management."[33]  She also stated that "[she] provide[d] solutions to members that are in the best interest of Centene…" and that she ensured that the quality of her work was at its best by paying attention to detail and "seeking the problem to find a solution for the member."[34] She stated that she "adapt[ed] well to providing new information, changes and the unexpected."[35]

In approximately September 2015, Plaintiff and 4 other Service Coordinators alleged they were overworked, requested Safe Harbor Peer Review under the Nurses Practices Act and refused to work.[36]  These allegations are clearly important to Plaintiff's claim as she recites them on the first page of her motion.[37]  Yet, these allegations are unique to only the handful of individuals who participated in Plaintiff's scheme to request a Safe Harbor Review.  To Defendants' knowledge, none of the remaining putative class members refused to do their jobs after requesting Safe Harbor Peer Review under the Nurses Practices Act, nor indicated that they even believe they are covered by the Nurses Practices Act in the first place.[38]

### D.     Opt-In Plaintiffs

Even the experiences of the individuals who have joined this suit demonstrate that there are key differences among each Service Coordinator that weigh against conditional certification.

---

[33] App. 32-34, Ex. B-3; Jackson 2015 Performance Review.
[34] Id.
[35] Id.
[36] [Doc. No. 30, p. 1]; App. 25, Ex. B, ¶ 18, Ross Declaration.
[37] Id.
[38] App. 25, Ex. B, ¶ 18, Ross Declaration. Defendants responded to Plaintiff's request for Safe Harbor Peer Review by reminding Plaintiff that she did not perform duties that would invoke the Nurses Practices Act.  Plaintiff appears to believe this establishes that the Professional Exemption to the FLSA does not apply, but fails to recognize that even if the Professional Exemption does not apply, the Administrative Exemption to the FLSA does.  In any event, Plaintiff fatally points to allegations and evidence that is unique to her and only a handful of Service Coordinators. She is not similarly situated to the class of individuals she seeks to represent.

Plaintiff attached cookie cutter declarations from these Opt-in Plaintiffs, which are nearly identical, particularly in terms of the job duties they identify.[39]  However, Plaintiff and Opt-in Plaintiffs differ in terms of job position, job duties, location, hours worked, background and supervisors.   For example, Opt-in Plaintiff Marshall held the position of 210146 - Service Coordinator, while Plaintiff Jackson held the position of 210852 – Service Coordinator (Field).[40]

Plaintiff and 7 of the Opt-in Plaintiffs were or are currently employed by Centene in the Dallas office within the Dallas DSA and reported to 15 different supervisors over the course of their employment.[41]  One of the Opt-in Plaintiffs was employed in the Austin office within the Travis DSA, one worked in the San Antonio area and one worked exclusively from home in Houston, Texas within the Harris DSA and was not even assigned to a Centene office.  Plaintiff and the Opt-in Plaintiffs have never worked out of 4 of the 7 Centene offices.  Likewise, Plaintiff and the Opt-in Plaintiffs have never worked in 10 of the 14 DSAs.

There are differences in the number of hours worked by Plaintiff and Opt-in Plaintiffs as well.  For example, Plaintiff states she worked at least 70 hours per week while Opt-in Plaintiff Blanchie Hobbs states she worked at least 45 hours per week.[42]  Additionally, some Opt-in Plaintiffs have a background as licensed vocational nurses ("LVN") while others have a background in social work.[43]  Opt-in Plaintiffs also differ in the products and programs they support.  For example, Plaintiff and 5 Opt-in Plaintiffs work or worked with MMP, two worked

---

[39] Jackson Declaration, ¶¶3,4 [Doc. No. 30-9]; Craig Declaration, ¶¶3,4 [Doc. No. 30-10]; Hobbs Declaration, ¶¶3,4 [Doc. No. 30-11]; Rone Declaration, ¶¶3,4 [Doc. No. 30-12]; Jules Declaration, ¶¶3,4 [Doc. No. 30-13]; Davis Declaration, ¶¶3,4 [Doc. No. 30-14]; Gilliam Declaration, ¶¶3,4 [Doc. No. 30-15]; Ali Declaration, ¶¶3,4 [Doc. No. 30-16]; Pokluda Declaration, ¶¶3,4 [Doc. No. 30-17]; Marshall Declaration, ¶¶3,4 [Doc. No. 30-18]; Hall Declaration, ¶¶3,4 [Doc. No. 38-1].
[40] App. 34, Ex. B-5, Marshall Employee History; App. 35, Ex. B-6, Jackson Employee History.
[41] App. 23-24, Ex. B, ¶ 11, Ross Declaration.
[42] Jackson Declaration, ¶6 [Doc. No. 30-9]; Hobbs Declaration, ¶6 [Doc. No. 30-11].
[43] Jackson Declaration, ¶4 [Doc. No. 30-9]; Ali Declaration, ¶3 [Doc. No. 30-16]; Pokluda Declaration, ¶3 [Doc. No. 30-17]; Marshall Declaration, ¶3 [Doc. No. 30-18].

with STAR+PLUS and two worked with STAR Health Foster Care.[44]  Plaintiff and the Opt-in

Plaintiffs did not work with the CHIP, CHIP Perinatal Care or STAR product lines. [45]

Additionally, Plaintiff and the Opt-in Plaintiffs did not work with Nursing Facility members.

## IV.
## PLAINTIFF IS NOT SIMILARLY SITUATED TO THE PUTATIVE CLASS MEMBERS

There are numerous differences among Service Coordinators that impact whether they

are exempt under the FLSA and demonstrate why they are not similarly situated, making this

action inappropriate for conditional certification.  Because the differences in job duties across the

putative class members are too numerous to recite within the page limits allowed for Defendants'

response, Defendants have attached a chart summarizing the additional material differences in

the job duties of the putative class Plaintiff seeks to represent.[46]  Briefly, some of the differences

include, but are not limited to:

- **Service Programs.** Some Service Coordinators are involved with Long Term Support Services (LTSS), [47] which coordinates home-delivery meals, emergency response systems and providers services. Others work for the StarPlus Intellectual Developmental Disabilities (IDD) program,[48] which deals with members with various intellectual developmental issues. Some Service Coordinators' primary job duties are to work with nursing facility members[49] to assist with their transition from hospital to the community and to prevent the members' health from requiring re-admission to a hospital or nursing facility.[50] Others are responsible for ensuring that members can stay safely at home without being admitted to a nursing home.[51]  Others work in the Foster Care Department[52] and are responsible for ensuring that when a child is discharged from the hospital, the child receives the appropriate services.

- **Assessments.** While most Service Coordinators perform some sort of assessment on the members they are responsible for, the types of and frequency of the assessments of members

---

[44] App. 24, Ex. B, ¶ 16, Ross Declaration.
[45] Id.
[46] App. 59-71, Ex.  F, Chart of Differences Among Putative Class; App. 72-76, Ex. G, Franklin Declaration; App. 77-81, Ex. H, Libiran Declaration; App. 82-87, Ex. I, Sanchez Declaration; App. 88-91, Ex. J, Martinez Declaration
[47] App.  93, Ex.  K, Diana Martinez-Lujan  Declaration ¶6; App. 48, Ex. D, Acker Declaration ¶2.
[48] App. 100, Ex. L, Anderson  Declaration ¶8; App. 107, Ex. M, Caballero Declaration ¶5, 19; App. 115, Ex. N, Manalo Declaration ¶2.
[49] App. 123, Ex.  O Smith Declaration ¶4; App. 129, App. 129, Ex. P, Elizondo Declaration ¶5.
[50] Id.
[51] Id.
[52] App. 99, Ex. L, Anderson Declaration ¶5.

also differ depending on the product line.  For example, a MMR Service Coordinator may only do one assessment a day, where a Nursing Facility Service Coordinator may handle up to 15 assessments in a day.[53]  There are also some assessments, like the Health Risk Assessment, that must be completed by Service Coordinators with a nursing degree.[54] Other assessments, like the Personal Attendant Services Assessment, must be conducted real-time with the member.[55]

- **Care Plans**. Some Service Coordinators put together care plans for members, while others do not.[56]

- **Special Projects.** Job duties vary based on assignments and special projects.  For example, a Service Coordinator may be assigned to complete Medicaid waivers as a special project and spend most of his or her time on this project.[57]

- **Medical Equipment.** A Service Coordinator in the Foster Care Department may spend ten hours per week coordinating medical equipment for members while another Service Coordinator spends only 2 hours per week doing the same.[58]

- **Meetings.** A Service Coordinator in the Foster Care Department may spend 5 to 10 hours per week in meetings, while a Service Coordinator in a different program spends only 2 to 5 hours per week in meetings.[59] Others spend only one hour per month in meetings.[60]

- **Interaction with Families/Hospital Staff.** Some Service Coordinators spend much of their time working directly with hospital staff to coordinate services, while others may not.[61]

- **Workload.** Service Coordinators' workload also varies.  Caseloads vary from about 10 members to 400.[62]  One Service Coordinator's case load varies every three months.[63]

- **Education of Members.** Service Coordinators sometimes have to educate members about funding sources, or other aspects of the services they may receive.[64] However, for some, educating members is less of their responsibility because they deal with members in a nursing facility who are already receiving around-the-clock care.[65]

---

[53]  App. 137, Ex. Q, De la Rosa Declaration, ¶14, App. 125, Ex. O, Smith Declaration ¶12.
[54]  App. 142, Ex. R, Richardson Declaration ¶9.
[55] Id. at ¶12.
[56] Ex. K, Martinez-Lujan Declaration ¶21; App. 117, Ex. N, Manalo Declaration ¶10; App. 150, Ex. S,  Dworaczyk Declaration ¶11; App. 146, Ex. R, Richardson Declaration  ¶26.
[57] App. 57, Ex E Zargoza Declaration ¶19.
[58] App. 101, Ex.  L, Anderson Declaration ¶12.
[59] App. 101, Ex.  L, Anderson Declaration ¶11; App. 145, Ex. R, Richardson Declaration ¶19.
[60] App. 113, Ex. M, Caballero Declaration ¶29.
[61]  App. 100, Ex. L, Anderson Declaration ¶9; App. 107, Ex. M, Caballero Declaration ¶7; App. 143, Ex. R, Richardson Declaration ¶13.
[62] App. 109, Ex. M, Caballero Declaration ¶12.
[63] App. 130, Ex. P, Elizondo Declaration ¶7; App. 154, Ex. T, Gentzel Declaration ¶7.
[64] App. 55, Ex. E, Zaragoza Declaration, ¶6-7; App. 103, App. 103, Ex. L, Anderson Declaration ¶18;App. 144,  Ex. R, Richardson Declaration ¶15.
[65]  App. 131-132, Ex. P, Elizondo Declaration ¶12.

- **Locations.** Service Coordinators in rural areas, like Lubbock, may spend more time traveling to and from members' homes than they do conducting assessments while Service Coordinators in urban areas spend far more time conducting assessments than they do traveling.[66]

- **Hours.** The hours worked by Service Coordinators vary drastically.  Some Service Coordinators work only 40 hours per week;[67] while other Service Coordinators state that they work 40 to 50 hours per week and Plaintiff claims she worked up to 70 hours per week.[68]

- **Background.** Educational backgrounds and experiences differ and impact how Service Coordinators approach their job, and the decisions they make.[69]

In addition to the differences described above, even if two Service Coordinators work in the same program, their day-to-day duties may differ – directly contradicting Plaintiffs' allegations that all Service Coordinators perform the same functions under the same conditions.[70] For example, one Service Coordinator who worked with Foster Care members was required to work directly with hospital staff to coordinate services a member received after leaving the hospital.[71]  Out of the 25-50 Service Coordinators with Foster Care members (over a period of time), only 2-3 other Service Coordinators worked with hospital staff.[72]  Thus, even among Service Coordinators working with the same product or group of members, job duties substantially vary.  Further, an individual Service Coordinator's job duties may change over time.  One Service Coordinator testified she did not conduct any assessments when she started, but does now.[73]

---

[66] App. 93, Ex. K, Martinez-Lujan Declaration ¶9; Ex. M, Caballero Declaration ¶13; App 119, Ex. N, Manalo Declaration ¶17.
[67] App. 102, Ex. L, Anderson Declaration ¶14, 21, 24; App. 106, 111, Ex. M, Caballero Declaration ¶2, 20; App. 93, 96, Ex. K, Martinez-Lujan Declaration ¶8, 23.
[68] App. 116, Ex. N, Manalo Declaration ¶6.
[69] Id. at ¶19.
[70] Jackson Declaration, ¶7 [Doc. 30-9].
[71] App. 100, Ex. L, Anderson Declaration ¶9.
[72] Id.
[73] App. 42-43, Ex. C, Garcia, ¶¶9,13.

**A.     Plaintiff Cannot Credibly Claim She is Similarly Situated to Putative Class Members in 4 of 7 Offices and 10 of 14 DSAs**

While the declarations submitted by Plaintiff contend other Level 2 Coordinators "performed similar job duties . . ." they are scant on detail as to how the declarants have such personal knowledge – especially since most of them routinely worked alone and/or from their home office.[74] Despite the declarants' sweeping and incredible claim that they have personal knowledge regarding the job duties of all the putative class members,[75] other Service Coordinators testified that it is not possible for them to have personal knowledge regarding the job duties of other Service Coordinators—especially those working with other product lines or in other DSAs.[76] A Service Coordinator in the San Antonio area testified, "I do not believe it is possible that a Service Coordinator in Dallas working with a different product line could have any idea what my job duties are."[77] Another Service Coordinator testified that while he works with other Service Coordinators on the MMP program, he "would have little personal knowledge about how they [other Service Coordinators] approach their job or the hours that they work."[78] Yet another Service Coordinator testified that "there is no way that a Service Coordinator in [a] service area outside Lubbock/MRSA could have personal knowledge regarding my job duties."[79] In short, Service Coordinators do not work side-by-side, and therefore, one Service Coordinator will have little actual knowledge about another Service Coordinator's work.

---

[74] Jackson Declaration, ¶7 [Doc. No. 30-9]; Craig Declaration, ¶7 [Doc. No. 30-10]; Hobbs Declaration, ¶74 [Doc. No. 30-11]; Rone Declaration, ¶7 [Doc. No. 30-12]; Jules Declaration, ¶7 [Doc. No. 30-13]; Davis Declaration, ¶7 [Doc. No. 30-14]; Gilliam Declaration, ¶7 [Doc. No. 30-15]; Ali Declaration, ¶7 [Doc. No. 30-16]; Pokluda Declaration, ¶7 [Doc. No. 30-17]; Marshall Declaration, ¶7 [Doc. No. 30-18].
[75] Id.
[76] App. 103, Ex. L, Anderson Declaration ¶22; App. 95, Ex.  K, Martinez-Lujan Declaration ¶19, 24; Ap. 119, Ex. N, Manalo Declaration ¶20; App. 151, Ex.  S, Dworaczyk Declaration ¶15,17; App. 52, Ex. D, Acker Declaration ¶23.
[77] App. 103, Ex. L, Anderson Declaration ¶22.
[78] App. 119, Ex. N, Manalo Declaration ¶20.
[79] App. 52, Ex. D, Acker Declaration ¶23.

While several examples of differences in job duties have been mentioned above, a comparison of a Nursing Facility Service Coordinator to a MMP Service Coordinator is instructive to illustrate the many ways just two Service Coordinators' job duties vary. Lawrence Manalo, a MMP Service Coordinator in San Antonio performs job duties that are vastly different from the job duties performed by Hope Smith, a Nursing Facility Service Coordinator in the Lubbock/MRSA service area. For example, Manalo received two weeks of classroom training that he describes as extensive and specific to the MMP product line.[80] Smith received four weeks of initial training that included time in the field shadowing Nursing Facility Service Coordinators.[81] Manalo describes his job as a nurse care manager and testified that his main goal is to keep members out of the hospital and safe at home,[82] while Smith describes her job as conducting assessments at nursing facilities to ensure member needs are met and to determine whether they are capable of living on their own.[83] She also assists in transitioning members from nursing facilities to the community.[84]

Manalo's case load has ranged from approximately 180 to 350 members.[85] Many of his members do not currently use services, so he only needs to make periodic contact with them to inform them of their benefits.[86] Smith, on the other hand, conducts assessments on a quarterly basis, or more frequently as needed.[87] Manalo sees no more than 2 members a day, while Smith will see anywhere from 1 to 15 members a day.[88] For Manalo's product and DSA, there is a

---

[80] App. 115, Ex. N, Manalo Declaration ¶ 4.
[81] App. 123, Ex. O, Smith Declaration ¶ 5.
[82] App. 116, Ex. N, Manalo Declaration ¶ 7.
[83] App. 123, Ex. O, Smith Declaration ¶ 4.
[84] Id.
[85] App. 116, Ex. O, Manalo Declaration ¶ 8.
[86] Id.
[87] App. 124, Ex. O, Smith Declaration ¶ 7.
[88] App. 125-126, Ex. O, Smith Declaration ¶ 12; App. 117, Ex. N, Manalo Declaration ¶ 9.

scheduling team that has access to his calendar and coordinates appointments with members on his behalf, while Smith schedules her own visits without relying on a scheduling team.[89]

Manalo primarily conducts in-home face to face member assessments in order to develop and approve service plans for government-sponsored healthcare plans.[90] He conducts assessments for members receiving long term services that are set to expire or who have a change in their condition.[91] Manalo asks questions to determine what services are needed and how much time the member needs for each service.[92] Conversely, Smith primarily conducts assessments at nursing facilities.[93] Before conducting assessments, she meets with the Social Worker and reviews the member's medical chart, which includes the member's care plan, medications, diagnoses and MDS (Minimum Data Set).[94] Smith then meets with the member and completes a nursing facility assessment form for the state.[95] She provides information regarding the member's admit date to the to the nursing facility, informal support services, when she met with the member, physical health diagnoses, medications, mental health intellectual disability diagnoses and whether they require any add on services such as physical therapy, speech therapy or occupational therapy.[96] When she conducts regular nursing facility assessments, she does not make determinations regarding how much time members will receive for various Medicaid services like other Level II Service Coordinators (such as Manalo) do.[97] For example, she does not ask whether members in a nursing facility need bathing assistance or

---

[89] App. 124, Ex. O, Smith Declaration ¶ 7; App. 117, Ex. N, Manalo Declaration ¶ 9.
[90] App. 118, Ex. N, Manalo Declaration ¶ 10.
[91] App. 117, Id. at ¶ 11.
[92] App. 117, Id. at ¶¶ 10-12.
[93] App. 124, Ex. O, Smith Declaration ¶ 7.
[94] Id.
[95] Id.
[96] Id.
[97] Id.

determine how much time they need for bathing assistant services.[98]  When Smith is notified that a member wants to transition into the community, the assessment she conducts is different—at that point she assesses how much time the member will need for various services.[99]

The type of assessments Manalo conducts require anywhere from 45 minutes to 3 hours.[100]  On average, Smith spends approximately 30 minutes conducting assessments and completing the state form takes no more than 10 minutes.[101]  Manalo updates health risk assessments while Smith does not.[102]  Manalo testified that the most important decisions he makes relate to approving or denying requested services.[103]  Smith makes crucial decisions regarding whether to transition a member from a nursing facility to the community.[104]  Unlike other putative class members, Manalo is responsible for training some new Service Coordinators.[105]  Unlike other putative class members, Smith has not been asked to work on special projects.[106]

The differences between Manalo and Smith are just one example of how varied the job duties are for Level II Service Coordinators.

# V.
## ARGUMENT

A.    **Legal Standard for Conditional Certification**

The decision to create an opt-in class under § 216(b) remains soundly within the discretion of the district court.  *Hoffman-La Roche, Inc.,* 493 U.S. at 169.  Since Section 216(b) does not define the term "similarly situated," courts have fashioned different tests to determine

---

[98] Id.
[99] Id.
[100] App. 119, Ex. N, Manalo Declaration ¶ 17.
[101] App. 125-126, Ex. O, Smith Declaration ¶ 12.
[102] App. 126, Ex. O, Smith Declaration ¶ 16; App. 117, Ex. N, Manalo Declaration ¶ 11.
[103] App. 118, Ex. N, Manalo Declaration ¶ 14.
[104] App. 125, Ex. O, Smith Declaration ¶ 10.
[105] App. 119, Ex. N, Manalo Declaration ¶ 19.
[106] App. 126, Ex. O, Smith Declaration ¶ 17.

whether class certification is appropriate. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1213-14 (5th Cir. 1995).   The Fifth Circuit has not endorsed any particular test, and courts in this Circuit have recognized different methods to determine whether to authorize notice to similarly situated employees advising them of their right to join an FLSA collective action.   *See id.* at 1216.   Those methods include the "two-step" *Lusardi* approach, *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987), the class action-based *Shushan* approach, *Shushan v. Univ. of Colo. at Boulder*, 132 F.R.D. 263 (D. Colo. 1990), and the modified *Lusardi* approach, under which courts apply a more stringent standard at the conditional certification stage based on the factual record before the court.   *See, e.g., Basco v. Wal-Mart Stores, Inc.*, No. 00-3184 , 2004 U.S. Dist. LEXIS 12441, at *13-14 (E.D. La. July 1, 2004).

Here, Plaintiffs seek conditional certification under the *Lusardi* approach, arguing that it was "upheld" by the Fifth Circuit in *Mooney*.   However, the Fifth Circuit specifically declined to endorse the *Lusardi* approach in that opinion, and, since *Mooney*, has remained silent on its endorsement of this approach.   *See Mooney*, 54 F. 3d 1207 (declining to decide whether the *Lusardi* approach or the spurious class action approach, described below, is the proper inquiry, as the plaintiffs in that case failed under both tests); *Roussell v. Brinker Int'l, Inc.*, 441 F. App'x 222, 226 (5th Cir. 2011) ("Like several other circuits, this court has never set a legal standard for collective-action certification.").

Plaintiffs seek to employ the *Lusardi* approach because the first step of *Lusardi* is the most lenient standard that has been applied to the certification question in the Fifth Circuit. Factors, however, militate against conditionally certifying the class under the lenient "first-step" *Lusardi* standard.   First, Plaintiffs urge this Court to follow a path that other courts have treaded, with disastrous results.   In *Proctor v. Allsups Convenience Stores, Inc.*, 250 F.R.D. 278 (N.D.

Tex. 2008), the court certified a class of thousands without analyzing whether the class could be effectively and/or efficiently managed.  Thirty-four depositions and 1,072 opt-in plaintiffs later, when the Court *did* consider whether it could "coherently manage the class," it became obvious that the class was unmanageable.  *Id*. at 282-84.  The court decertified the class and dismissed the 1,072 opt-in plaintiffs from the case.  *Id*.

The outcome of the *Allsups* case is not unique—other courts have experienced similarly disastrous and costly results.  Because the "relevant inquiry in each particular case is whether it would be appropriate to exercise" the court's discretion to facilitate notice, the appropriate methodology is highly dependent on the specific evidence and circumstances of each case.  *See Hoffman-La Roche, Inc.*, 493 U.S. at 169.   Here, the Court should consider all the evidence of record and apply a level of scrutiny that such evidence merits.  *See, e.g.*, *Ray v. Motel 6 Oper. Ltd.*, No. 3-95-828, 1996 U.S. Dist. LEXIS 22565, at *9 (D. Minn. 1996) (applying stringent standard at the initial stage because "the facts before the Court are extensive [and] there is no need for discovery in order to reach a determination.").

Even under the lenient *Lusardi* approach, Plaintiff must still materially demonstrate that the action does not arise from circumstances purely personal to her.  *Aguirre*, 2007 U.S. Dist. LEXIS 17259, at *25 (citing *England*, 370 F. Supp. 2d at 507.  Instead, at the first stage, there must be a showing of "some identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency."  *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010).[107]  Moreover, this initial stage is not automatic.  *Badgett v.*

---

[107] Courts in the Fifth Circuit, and this Court, routinely deny conditional certification, even under the "fairly lenient" Lusardi standard when plaintiffs fail to meet this burden.  *See, e.g., Richardson*, 2012 U.S. Dist. LEXIS 12911, at *9, *31 (applying Lusardi conditional certification standard and denying conditional certification); *see also Marshall v. Eyemasters of Texas, Ltd*., 272 F.R.D. 447, 450 (N.D. Tex. 2011); *Stiles v. FFE Transp. Servs., Inc.*, No. CIV.A.309-CV-1535-B, 2010 WL 935469, at *3 (N.D. Tex. Mar. 15, 2010); *Songer*, 569 F. Supp. 2d at 705-06; *Harris v. Fee Transp. Servs., Inc*., No. CIV.A.3:05CV0077-P, 2006 WL 1994586, at *3-5 (N.D. Tex. May 15, 2006).

*Texas Taco Cabana, L.P.*, No. H-05-3624, 2006 U.S. Dist. LEXIS 74530, at *5 (S.D. Tex. Oct. 12, 2006) (denying conditional certification); *see also Richardson*, 2012 U.S. Dist. LEXIS 12911, at *9, 31 (denying conditional certification under the "lenient" first step of *Lusardi*). **Further, "it is not enough for Plaintiffs to show that some members of the proposed class may be similarly situated to them.  Rather, Plaintiffs must offer some evidence that the proposed class, as a whole, is made up of individuals that are similarly situated to them."** *Metcalfe v. Revention, Inc.*, 2011 U.S. Dist. LEXIS 83966, at *6-7 (S.D. Tex. Aug. 1, 2011) (citing *McKnight*, 756 F. Supp. 2d at 801  (emphasis added)).  In deciding whether plaintiffs have met their burden, this Court "is mindful that it, like practicing attorneys, has a responsibility to refrain from stirring up unwarranted litigation." *Id.* (citing *Lentz v. Spanky's Rest. II, Inc.,* 491 F.Supp.2d 663, 669 (N.D. Tex.2007).  Thus, "employers should not be unduly burdened by a frivolous fishing expedition conducted by the plaintiff at the employer's expense[]." *Songer*, 569 F. Supp. 2d at 706-07.

B.     **Plaintiff Cannot Even Meet the Lenient *Lusardi* Standard**

Even if this Court declines to apply a more stringent standard in evaluating whether to conditionally certify the proposed class, Plaintiff cannot meet the lenient standard she promotes. Other than sweeping and unsupported allegations regarding job responsibilities (as opposed to tasks) for Service Coordinators for whom Plaintiff has no actual knowledge, Plaintiff's Motion is noticeably devoid of <u>any evidence</u> with respect to any Service Coordinator outside 4 of the 7 offices and 10 of the 14 DSAs.

Plaintiff failed to produce any credible evidence in support of the lenient *Lusardi* standard, much less the standard that should be applied here—whether the Court should exercise its discretion to notify putative class members when the proposed class lacks common proof and the Court would face hundreds of mini-trials.

1.      <u>**Plaintiff is Not Similarly Situated to The Putative Class Members**</u>

Plaintiff points to job descriptions for Service Coordinator positions in an attempt to show that *all* Service Coordinators are similarly situated.  However, courts have found that a generic job description does not illustrate the actual duties of each individual putative class member for purposes of an FLSA exemption analysis.  *See Vela v. City of Houston*, 276 F.3d 659, 677 (5th Cir. 2001) ("A generic job description tells us nothing about the specific duties of each Manager or what percentage of time was spent on management activities."); *see also Elliott v. Dril-Quip, Inc.*, No. CV H-14-1743, 2015 WL 7302764, at *6 (S.D. Tex. Nov. 18, 2015) ("While general job . . . may be considered, it is the actual day-to-day activities of the employees that determine whether the employee is exempt . . ."). Furthermore, just because putative class members may share a job title does not necessarily mean they performed the same work.  *Reyes v. Texas Ezpawn, L.P.*, No. CIV.A. V-03-128, 2007 WL 101808, at *4 (S.D. Tex. Jan. 8, 2007).  "[W]here duties do not correlate with titles, there must be some other means of identifying and binding the employees; otherwise, each claimant would require an individualized inquiry." *Blake v. Hewlett-Packard Co.*, No. 4:11-CV-592, 2013 WL 3753965, at *8 (S.D. Tex. July 11, 2013); *See Aguirre,* 2007 WL 772756, at *14.

Here, Plaintiffs cannot identify any means of binding the putative class members.  In fact, as described in detail above, Service Coordinators' job duties and hours worked vary drastically based on a number of factors.

2.      <u>**There is No Common Illegal Policy**</u>

"If the plaintiffs cannot show that the . . . 'putative class members were together the victims of a single decision, policy, or plan' that violates the FLSA, the court **should not** conditionally certify the class." *Casanova vs. Gold's Tex. Holdings Grp., Inc.*, 2014 U.S. Dist. LEXIS 161844, at *4-5 (citing, *inter alia*, *Mooney*, 54 F.3d at 1214, n.8) (emphasis added).

21

The only "decision, policy or plan" that Plaintiff points to is Defendants' alleged misclassification of Service Coordinators.  Plaintiff alleges that "[i]nstead of paying these individuals on an hourly, non-exempt basis, Defendants pay all of their Texas based Service Coordinators on a salaried basis that fails to pay proper and lawful regard to their actual hours worked."[108]  However, "the mere classification of a group of employees…as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as 'similarly situated' for § 216(b) purposes." *Vasquez v. Vitamin Shoppe Indus. Inc.*, No. 10 CIV. 8820 LTS THK, 2011 WL 2693712, at *4 (S.D.N.Y. July 11, 2011) (citing *Bramble v. Wal–Mart Stores, Inc.,* No. 09–CIV–4932(TNO), 2011 WL 1389510, *4 (E.D. Pa. Apr. 12, 2011) (quoting *Colson v. Avnet, Inc.,* 687 F.Supp.2d 914, 927 (D. Ariz. 2010)).

Plaintiff's logic is not sound: Plaintiff attempts to argue that she is entitled to statewide certification because she has identified a handful of Service Coordinators whose allegedly identical job duties include non-exempt duties—all Service Coordinators are exempt; therefore, all Service Coordinators are misclassified.  Simply alleging misclassification of all Service Coordinators does not satisfy Plaintiff's burden.

### 3.     Plaintiff's Misclassification Claims Require Individualized Analysis

Even if there was a common illegal policy that applied to Plaintiff and the putative class, Plaintiff cannot proceed in a collective action because Defendants assert defenses that will require individualized analysis for Plaintiff and each of the putative class members.  Defendants assert that Plaintiff was not entitled to overtime pay because at least two exemptions to the FLSA's overtime requirements apply to Plaintiff and putative class members. In their defense,

---

[108] [Doc. No. 30].

Defendants assert the Professional Employee Exemption [109] and the Administrative Exemption, [110] or a combination of both exemptions depending on the Plaintiff's and opt-in plaintiffs' individual circumstances.  Each Plaintiff may fit under one or more exemption. "The exempt or non-exempt status of any particular employee must be determined on the basis of whether his duties, responsibilities, and salary meet all the requirements of the appropriate exemptions criteria." *Reyes*, 2007 WL 101808 at *5. "The relevant statutory exemption criteria will require an individual, fact-specific analysis of each [plaintiff's] job responsibilities." *Id.*

In "misclassification cases" where the employer has the burden to prove that a particular exemption applies, the regulations state that this issue is not to be resolved categorically, but individually.  *See* 29 C.F.R. § 541.2.  An employer may establish that a given employee's job duties qualify for an exemption although another employee with the same job title may perform duties that are determined to be non-exempt. *Id.*  Consequently, an employer should not be compelled to prove its claimed exemption in an across-the-board manner, but should have its evidence considered with respect to each employee, because the strength of that evidence may differ in each instance and the regulations state this issue is not to be resolved categorically, but individually.  *Id.*

That these sorts of individualized inquiries are crippling to the certification of a collective action is more than mere speculation – courts routinely decline to certify collective

---

[109] To qualify for the Professional Exemption: (1) an employee must be compensated on a salary or fee basis at a rate of not less than $455 per week; (2) whose primary duty is the performance of work: (a) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction; or (b) requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor.  29 C.F.R. § 541.300.

[110] To qualify for the Administrative Exemption: (1) an employee must be compensated on a salary or fee basis at a rate of not less than $455 per week; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200.

actions, even under a first stage analysis, where the necessity of individualized inquiries becomes apparent. *See Aguirre v. SBC Commc'ns, Inc.*, No. H-05-3198, 2007 U.S. Dist. LEXIS 17259, at *43 (S.D. Tex. Mar. 12, 2007) (holding "[g]iven the fact-intensive nature of the exemption analysis, the plaintiffs have not shown that they are similarly situated so as to make collective treatment of their claims proper under section 216(b) of the FLSA"). The proof required to establish the individualized exemption defenses alone would become the overwhelming focus of a trial, which would amount to trials of many individual cases. *Johnson v. TGF Precision Haircutters, Inc.,* No. CIV.A. H-03-3641, 2005 WL 1994286, at *6 (S.D. Tex. Aug. 17, 2005). The differences among the Plaintiffs and individualized, highly fact-intensive defenses, "would not only dominate but would swallow and consume the entire case." *Reyes*, 2007 WL 101808 at *6; *Johnson*, 2005 WL 1994286 at *7.

## C.    Proposed Notice

Plaintiff has already attempted to circumvent the court facilitated notice process by providing notice of this lawsuit to potential class members before filing her Motion for Notice and Conditional Certification. Plaintiff's counsel has sent at least two communications, which Defendants are aware of,[111] to potential class members that included details about this lawsuit such as a definition of the putative class, names of Plaintiff and opt-in plaintiffs, the belief that the recipient had the same duties as Plaintiff and opt-in plaintiffs, and contact information for Plaintiff's attorneys.[112] Notably, these communications did not resemble the formal notice Plaintiff now proposes. In addition to written communications, Opt-in Plaintiff Hall is apparently soliciting participation as well. In her declaration, filed on the same day Defendants'

---

[111] App. 113, Ex. M, Caballero ¶30 ("I have received one or two letters in the mail from the lawyers representing another employee who has invited me to join the lawsuit. I have not contacted this attorney and do not know how they received my information."
[112] App. 37-40, Ex. B, Ross Declaration; Ex. B-7.

response to Plaintiff's Motion for Notice was due, she testified that she talked to six Service Coordinators about this case, none of whom have joined the lawsuit.[113] [114] That more individuals have not opted into this suit, after receiving multiple notices via regular mail, email and telephone, also undermines Plaintiff's argument that others will elect to join.

Nonetheless, as Defendants submit that the Court should not order Court-supervised notice because conditional certification is unwarranted, any argument regarding the terms of such notice should be moot and are certainly premature. In the event the Court orders conditional certification, Defendants reserve the right to file objections to Plaintiff's proposed notice.

## VI.
## CONCLUSION

Plaintiff offers cookie cutter statements, and on that basis asks this Court to certify a class of individuals employed across the state, at multiple locations.  Plaintiff failed to establish a common policy or practice that applies to all putative class members and Plaintiff is not similarly situated to the opt-in Plaintiffs or the putative class members.  Service Coordinators perform widely divergent duties at various locations, reporting to various supervisors, supporting different programs, and serving different types of members.  These differences among the proposed putative class are significant; as such, determining the proper FLSA status of each employee would necessitate a fact-specific analysis of each individual's employment terms. Such an individualized analysis makes collective action inappropriate and unmanageable.

---

[113] Docket Entry 38-1, ¶¶8-9.
[114] In Hall's declaration she makes inflammatory remarks speculating that Service Coordinators who have decided not to join the lawsuit in fear of retaliation.  There is not a shred of evidence that any Service Coordinator has been retaliated against in relation to this lawsuit and Plaintiff is not asserting retaliation.

Dated June 10, 2016                    Respectfully submitted,


                                       */s/ Saba H. Alvi*
                                       _____
                                       Kimberly R. Miers
                                       Texas State Bar No. 24041482
                                       Saba H. Alvi
                                       Texas State Bar No. 24082324
                                       Jeremy W. Hawpe
                                       Texas State Bar No. 24046041

                                       LITTLER MENDELSON, P.C.
                                       A Professional Corporation
                                       2001 Ross Avenue
                                       Suite 1500, Lock Box 116
                                       Dallas, TX  75201.2931
                                       214.880.8100
                                       214.880.0181 (Fax)
                                       kmiers@littler.com
                                       salvi@littler.com
                                       jhawpe@littler.com

                                       ATTORNEYS FOR DEFENDANTS
                                       SUPERIOR HEALTHPLAN, INC. and
                                       CENTENE COMPANY OF TEXAS, L.P.

## <u>CERIFICATE OF SERVICE</u>

I hereby certify that on the 10th day of June, 2016, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, Dallas Division, using the electronic case filing system of the court.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system as follows:

Jack Siegel
Siegel Law Group PLLC
10440 N. Central Expressway
Suite 1040
Dallas, TX  75231
Jack@siegellawgroup.biz

J. Derek Braziel
J. Forester
Lee & Braziel, LLP
1801 N. Lamar Street, Suite 325
Dallas, Texas 75202
jdbraziel@l-b-law.com

/s/  Saba H. Alvi
Kimberly R. Miers
Saba H. Alvi

Firmwide:140714672.5 084761.1002

27